UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


JUDITH P. THOMAS,

          Plaintiff,

v.                                    Civil Action No. 2:07-671


WELLS FARGO INSURANCE
SERVICES OF WEST VIRGINIA, INC.
and WELLS FARGO BANK, N.A.,

          Defendants.


MEMORANDUM OPINION AND ORDER


          Pending are the plaintiff's motion to remand,[1] filed

November 19, 2007, and the defendants' motion to dismiss, filed

October 25, 2007.[2]


_____

          [1] Plaintiff has not filed a reply to defendants' response to
the motion to remand.  Any reply was to be filed by December 18,
2007.  (12/12/07 Order at 1).

          [2] Pending also is the defendants' motion to exceed page
limitation, filed on October 25, 2007.  Good cause to exceed the
page limitation provided by S.D. W. Va. Local Rule 7.1(a) has
been shown and accordingly, the motion be, and it hereby is,
granted.

I.

The plaintiff, Judith P. Thomas ("Thomas"), filed this
action in the Circuit Court of Kanawha County, West Virginia, on
September 18, 2007.  The relevant facts, as set forth in the
complaint and incorporated documents, are as follow.  Thomas, who
is a citizen and resident of West Virginia, was employed as
general counsel, senior vice president and assistant secretary by
defendant Wells Fargo Insurance Services of West Virginia, Inc.
("WFIS").  (Compl. ¶¶ 1,6).  WFIS, which was formerly known as
Acordia of West Virginia Inc. ("Acordia"), is a wholly owned
subsidiary of defendant Wells Fargo Bank, N.A. ("WFB").  (Id. ¶¶
2-3).  A provider of insurance brokerage and third party
administration services, WFIS is a West Virginia corporation
headquartered in Charleston, West Virginia.  (Id.)  WFB is a
national bank, with its principal place of business in San
Francisco, California, that provides banking, mortgage and
insurance services both nationally and internationally.  (Id. ¶¶
4-5).

Throughout her tenure with WFIS Thomas worked out of
Charleston, West Virginia and reported to Andrew J. Paterno,
WFIS's regional managing director.  (Id. ¶ 6).  On May 11, 2006,

2

Thomas had a telephone conversation with David Garfield ("Garfield"), an attorney employed by WFB.  (Id. ¶¶ 7, 10). According to the complaint, Garfield informed Thomas that she was to be transferred to new employment with WFB and as a result would report only to Michael W. Watson ("Watson"), another attorney employed by WFB.  (Id.)  Garfield stated further that if Thomas accepted the transfer, she would become "Counsel 4" in WFB's legal department and as of June 11, 2006, would receive the following compensation: an annual salary of $201,500; a "monetary bonus" for calendar year 2006 equal to 10 to 30% of her salary; and WFB stock options commensurate with her job classification of Counsel 4, typically valued at approximately $30,000.  (Id. ¶ 8). Thomas told Garfield that she accepted the proposal, at which point Garfield stated that he would advise Watson that WFB and Thomas "had an understanding about Plaintiff's reporting and compensation."  (Id. ¶ 9).  Following acceptance of WFB's offer, Thomas reported directly to Watson, who was located in Houston Texas, and indirectly to Garfield, who was located in Minneapolis, Minnesota.  (Id. ¶ 10).

Thomas met with Watson on June 21, 2006, and informed him that as of June 11, 2006, or the nearest pay period, she had not received the salary and job classification which induced her

3

to accept the position with WFB.  (Id. ¶ 11).  In response,
Watson told Thomas that he would implement the change.  (Id. ¶
12).  In a July 24, 2006, email, Thomas asked Watson about his
efforts to implement the change in her job classification and
compensation.  (Id.)  By email dated August 3, 2006, Watson
replied, stating, "I have discussed the job classification and
compensation issues with David [Garfield], and he has asked me
not to proceed until he gets back to me."  (Id. ¶ 13).

        Between August 3 and September 15, 2006, Thomas
attempted to discuss her job classification and compensation with
Watson and Garfield.  (Id. ¶ 14).  On September 15, 2006,
Garfield responded to Thomas' inquiries by suggesting that her
assistant call his assistant to schedule an appointment.  (Id.)
Thomas then scheduled a telephonic conference with Garfield for
September 18, 2006.  (Id.)  During the conference, Garfield told
Thomas that he had made an error in agreeing to pay Thomas a
salary of $201,500 on May 11, 2006, and that she would remain
employed at $150,000.  (Id.)  Garfield stated that he never
questioned Thomas' loyalty to WFIS or her abilities.  (Id.)
Garfield also stated that he should have "discussed the issue
with her earlier but had been 'chicken,' felt 'very bad' and did
not know what to do."  (Id.)  In response, Thomas told Garfield

4

that she was surprised by his explanation "and would get back with him regarding whether she was agreeable to his new proposal." (Id.) While the complaint is not clear on the point, Thomas seems to assert that following the September 18, 2006, teleconference, other discussions took place in an effort to resolve the question of Thomas' salary and whether she was willing to remain employed by WFB for less compensation than the amount represented by Garfield on May 11, 2006.[3] (Id. ¶ 18). Thomas' salary was never increased to $201,500, but on January 1, 2007, she was classified as a Counsel 4 with WFB. (Id. ¶ 16). According to the complaint, Thomas never agreed to work for WFB at a salary less than $201,500 as offered and accepted on May 11, 2006. (Id. ¶ 17).

Garfield traveled to Charleston, West Virginia on November 14, 2006, to meet with Thomas regarding undisclosed matters. (Id. ¶ 19). Despite Thomas' assumption that Garfield wanted to discuss her back pay and future compensation, at the meeting Garfield terminated Thomas' employment with WFB,

---

[3] The complaint states, "That the plaintiff understands that one or more additional discussions would occur to resolve the salary issue and whether she was willing to remain as an employee of Wells Fargo Bank, N.A. at a salary less than what she had accepted at the time of her employment on May 11, 2006." (Compl. ¶ 18).

effective January 18, 2007. (Id. ¶¶ 20-21). Thomas was told
that she would receive a $50,000 bonus for the 2006 calendar year
and would continue to receive her existing salary for the period
established by The Wells Fargo & Company Salary Continuation Pay
Plan ("the Plan"). (Id. ¶ 22; Plan at 11, Compl., ex. A). She
alleges that the Plan entitles her to 11 months of salary
continuation at her base salary in effect on her termination
date. Pursuant to its terms, employees who wish to participate
in the Plan must sign a release, (Plan at 6, Compl., ex. A), and
on January 17, 2007, plaintiff executed a document titled,
"Agreement and Release," accepting the terms of the Plan.
(Compl. ¶ 24; Agreement & Release, Compl., ex. B).

        The purpose of the Plan is "to provide compensation to
assist eligible employees . . . while they are seeking new
employment," in the event "displacements or job changes are
necessary for business reasons." (Plan at 2, Compl., ex. A).
Under the heading "The Basics," the Plan states that it
"complies with the requirements of the Employee Retirement Income
Security Act (ERISA) and is a 'welfare benefit plan' as that term
is described under ERISA." (Id.) A "Plan Administrator" has
"full discretionary authority to administer and interpret the
Plan." (Id. at 11). The Plan sets forth the requirements for

6

participation as well as certain disqualifying events.  (<u>Id.</u> at

2-3).  There are two events that may qualify an eligible employee

for salary continuation pay, namely, "position elimination" and

"substantial position change."  (<u>Id.</u> at 3).  Though the period

may be shorter, generally an employee who is subject to a

position elimination or substantial position change "will receive

a 60 calendar-day Notice Period as described in a written notice

of a Qualifying Event."  (<u>Id.</u> at 6).

          The following language is found under the heading

"General Release,"

> [t]o qualify for salary continuation pay under the
> Plan, you must sign the Release contained in your
> displacement package.  The Release is an agreement,
> signed by you and Wells Fargo, in which you agree to
> give up any and all claims, actions or lawsuits against
> Wells Fargo that relate to your employment with Wells
> Fargo.  You will have 45 days beginning the first day
> of the Notice Period to consider the terms of the
> Release . . . If you choose not to sign the Release or
> you revoke the Release, you will not receive salary
> continuation pay (or a lump sum severance payment) or
> be eligible for salary continuation leave, and your
> employment will be terminated at the end of your Notice
> Period.

(<u>Id.</u> at 6).  Explaining its mechanics, the Plan provides that,

"If you are an eligible participant, you have a Qualifying Event,

and you sign the Agreement and Release (the Release) provided to

you in your displacement package: . . . The amount of your

payments will be determined by your covered pay, your completed

7

years of service and your exemption status at the time the Notice Period ends." (Id. at 4).  Covered pay is defined, for most participants, "as your base salary . . . at the end of the Notice Period."  (Id. at 5).  The length of time a participant is to receive salary continuation pay is based upon the participant's covered pay, completed years of service and exemption status. (Id. at 5).  If the prerequisites for receiving benefits under the Plan are met, benefits "are paid from the general assets of Wells Fargo."  (Id. at 7).

The Plan sets forth an administrative scheme for resolving benefit disputes and under the heading "Claims and Appeals" provides:

**FILING A CLAIM**

Normally, salary continuation pay will automatically be paid to all eligible participants who qualify under the Plan.  However, if you have not received this benefit and you believe you are entitled to it, or if you believe you are entitled to a larger benefit than you are receiving, you may file a claim with the Plan Administrator.

**For Position Eliminations, you must file a claim within 90 days of any of the following:**[4]

- The date you learn the amount of salary continuation pay benefits available to you under the Plan; or
- The date you learn that there will be no salary

---

[4] In the Plan, the underlined text is in bold type.

8

> continuation pay benefit available to you under
> the Plan.

(Id. at 9).  Claims must be in writing, signed by the participant
or their representative, and briefly explain the claim.  (Id.)
The Plan states that claims review responsibility has been
delegated by the plan administrator to Wells Fargo's Corporate
Employee Relations Department. (Id. at 9).  An address is
provided for delivery of claims to the plan administrator in care
of the corporate employee relations department.  (Id. at 9).

Upon receipt of a claim, an "Employee Relations
Consultant" works with the claimant's "Human Resources
Consultant" to research the claim.  (Id.)  Unless an extension is
needed, the employee relations consultant will notify the
claimant of the decision to approve or deny the claim within 90
days.  (Id.)  If the claim is in any part denied, a written
notification is sent to the claimant stating the reason.  (Id.)
Should the claimant wish to appeal, they may do so by submitting
a written statement to the plan administrator in care of Wells
Fargo's Executive Vice President of Human Relations within 60
days of receipt of the denial notice.  (Id. at 10).  Unless an
extension is required, the executive vice president of human
resources will notify the claimant of its final decision within
60 days.  (Id.)  If the appeal is denied, a written explanation
is provided.  (Id.)

The Agreement and Release, which is four pages long, provides that Thomas and Acordia[5] acknowledge that effective November 20, 2006, Thomas "will have a Qualifying Event as defined by the Wells Fargo & Company Salary Continuation Pay Plan," and that effective November 20, 2006, Thomas was "provided 60 days notice of the Qualifying Event (the 'Notice Period')." (Agreement & Release at 1, Compl., ex. B).  On the first page, under the heading "Recitals," the Agreement and Release states:

> C. Upon timely execution of this Agreement and completion of the Notice Period, you are eligible to receive salary continuation pay in accordance with the terms of the Plan . . . .
>
> D. You understand that this Agreement contains, among other things, a release and waiver of all claims you may have, or could have, against the Company and that this release and waiver is given by you in exchange for salary continuation pay described in Recital C above. You acknowledge that you were given at least forty-five (45) days beginning on the first day of the written Notice Period to consider the terms of this Agreement and to seek the advice of an attorney before signing this Agreement.

(Id.)  Thomas acknowledged that she "received and read the Summary Plan Description of the Wells Fargo & Company Salary Continuation Pay Plan," and that she understood the terms of the Plan.  (Id.)  The Agreement and Release provides that "[y]ou

---

[5] The Agreement and Release provides that it is between Thomas and Acordia, "its parent companies, predecessors, successors, affiliates, subsidiaries, employees, officers, agents directors, advisors and consultants ('Company')."  (Agreement & Release at 1, Compl., ex. B).

understand that as consideration for your signature on this
Agreement, you are eligible for salary continuation pay. . . . If
you fail to execute this agreement, you will not receive any
salary continuation pay or Leave from the Company following the
end of your written Notice period." (Id. at 1-2).  A merger
clause is included and it is provided that the law of the state
where Thomas was assigned to work at the time she received her
notice of termination is to govern the agreement's validity and
interpretation.  (Id. at 2).  Under the heading "GENERAL
RELEASE," which is in bold type, the Agreement and Release
states:

> In exchange for the salary continuation pay
> described above, to which you are not otherwise
> entitled, you hereby release and forever discharge
> ACORDIA OF WEST VIRGINIA, INC., its parent companies,
> predecessors, successors, affiliates, subsidiaries,
> employees, officers, agents, directors, advisors and
> consultants (the "Company") from all claims,
> liabilities demands and causes of action, known or
> unknown, likely or unlikely, which you may have or
> claim to have against the Company, as a result of your
> employment or separation from employment.  This
> includes, but is not limited to, claims arising out of
> or related to the Wells Fargo & Company Salary
> Continuation Pay Plan, claims for wrongful termination,
> constructive discharge, termination in violation of
> public policy, claims for compensation due for any
> services performed by you, claims for breach of express
> or implied contract, any tort of any nature . . . .

> This release does not include claims for your
> vested interest in any other employee benefit plan
> governed by the Employee Retirement Income Security Act
> of 1974 and maintained by the Company, nor pending
> unemployment insurance or workers compensation claims.
> This release also does not waive rights or claims which

may arise after the date this agreement is signed.
(Id. at 3-4).  Thomas initialed the Agreement and Release at the bottom of each page and her signature, dated January 17, 2007, is found at the end.  On January 18, 2007, Avid Modjtabai, executed the Agreement and Release on behalf of Wells Fargo & Company.

Thomas' four-count complaint asserts the following claims: Count I, violation of the West Virginia Wage Payment Collection Act ("WPCA") for failure to pay Thomas the pro-rated difference between Thomas' annual salary of $150,000, and agreed upon annual salary of $201,500, for the period of June 11, 2006, though January 18, 2007, within 72 hours of the termination of her employment; Count II, violation of the WPCA for failure to pay Thomas under the Wells Fargo Salary Continuation Pay Plan at an annual base salary of $201,500 within 72 hours following the end of each payroll period after January 18, 2007; Count III, violation of the WPCA for failure to provide Thomas with Wells Fargo stock options valued at approximately $30,000 within 72 hours of the termination of her employment; and Count IV, breach of oral and written contract.

On October 24, 2007, the defendants removed, invoking the court's federal question jurisdiction.  (Not. of Rem. ¶ 3). The defendants state that every claim in the complaint is subject to the doctrine of "complete preemption" and therefore properly

removable to this court.  (Id. ¶¶ 6-8).  In the event some, but
not all, of Thomas' claims are completely preempted, the
defendants contend that supplemental jurisdiction exists over any
state law claims.  (Id. ¶ 9).  On October 25, 2007, the
defendants moved to dismiss the complaint in its entirety and on
November 19, 2007, Thomas moved to remand.  Pursuant to the
request of the parties, on December 12, 2007, the court stayed
this action pending resolution of the motion to remand.

## II.

"Except as federal law may otherwise provide, when a
defendant removes a state civil action to federal district court,
federal removal jurisdiction exists if the action is one 'of
which the district courts of the United States have original
jurisdiction.'"  In re Blackwater Sec. Consulting, LLC, 460 F.3d
576, 583 (4th Cir. 2006) (quoting 28 U.S.C. § 1441(a)).  Pursuant
to 28 U.S.C. § 1331, district courts possess original
jurisdiction over "all civil actions arising under the
Constitution, laws, or treaties of the United States."  This form
of original jurisdiction is known as federal question
jurisdiction.  Id.

13

Ordinarily, "determining whether a particular case arises under federal law turns on the 'well-pleaded complaint' rule." Aetna Health Inc. v. Davila, 542 U.S. 200, 207 (2004) (citing Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 9-10 (1983)). The well-pleaded complaint rule provides that "federal question jurisdiction is limited to actions in which the plaintiff's well-pleaded complaint raises an issue of federal law; actions in which defendants merely claim a substantive federal defense to a state-law claim do not raise a federal question." Nordan, 460 F.3d at 584 (citing Louisville & N.R. Co. v. Mottley, 211 U.S. 149, 152 (1908)). The jurisdictional doctrine of "complete preemption," however, affords an exception to the well-pleaded complaint rule, "[w]hen a federal statute wholly displaces the state-law cause of action." Davila, 542 U.S. at 207. "This is so because when the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." Id. (internal quotation marks omitted).

While there is a presumption "against finding complete preemption," the presumption is rebuttable. See Lontz v. Tharp,

14

413 F.3d 435, 441 (4th Cir. 2005) (quoting <u>Franchise Tax Bd. of</u>
<u>Cal. v. Constr. Laborers Vacation Trust</u>, 463 U.S. 1, 23 (1983)).
The burden of demonstrating the propriety of removal is on the
removing party, and federalism demands strict construction of
removal jurisdiction.  <u>See</u> <u>Mulcahey v. Columbia Organic Chem.</u>
<u>Co., Inc.</u>, 29 F.3d 148, 151 (4th Cir. 1994).

        Federal Rule of Civil Procedure 8(a)(2) requires that a
pleader provide "a short and plain statement of the claim showing
. . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2);
<u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007).  Rule 12(b)(6)
correspondingly permits a defendant to challenge a complaint when
it "fail[s] to state a claim upon which relief can be granted . .
. ."  Fed. R. Civ. P. 12(b)(6).

        The required "short and plain statement" must provide
"'fair notice of what the . . . claim is and the grounds upon
which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544,
545 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957),
<u>overruled on other grounds</u>, <u>Twombly</u>, 550 U.S. at 563); <u>see</u> <u>also</u>
<u>Anderson v. Sara Lee Corp.</u>, 508 F.3d 181, 188 (4th Cir. 2007).
In order to survive a motion to dismiss, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'"  <u>Ashcroft v.</u>

15

Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

Application of the Rule 12(b)(6) standard requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" Erickson, 127 S. Ct. at 2200 (quoting Twombly, 127 S. Ct. at 1965); see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

## III.

For purposes of analysis, it is helpful to group the claims in the complaint according to their temporal focus.  The first group consists of Count II, and the portion of Count IV seeking recovery for breach of written contract.  These claims focus on events transpiring after the lapse of the 72 hour period that followed Thomas' termination as an employee of WFB on

16

January 18, 2007.  The second group of claims includes Counts I
and III, as well as Count IV's claim for breach of the oral
contract entered into on May 11, 2006.  These claims focus on
events occurring prior to, or within 72 hours after, January 18,
2007.

A. Removal

        The defendants argue that Thomas' claims are all
completely preempted by the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and thus support
federal question jurisdiction.  It should be noted that complete
preemption is not the same as the traditional concept of
"conflict preemption."  Conflict preemption occurs under ERISA to
the extent state law claims "relate to" an ERISA employee benefit
plan.  See 29 U.S.C. § 1144(a); Darcangelo, 292 F.3d at 187.
Conflict preemption alone, however, does not implicate a federal
court's jurisdiction, but is instead a defense to state law
claims.  See Darcangelo, 292 F.3d at 187.  Complete preemption,
on the other hand, is a federal jurisdictional doctrine.
Complete preemption takes place where,

        Congress "so completely pre-empts a particular area
        that any civil complaint raising this select group of
        claims is necessarily federal in character." Taylor,

17

> 481 U.S. at 63-64. That is to say, the doctrine of
> complete preemption "converts an ordinary state common
> law complaint into one stating a federal claim." Id. at
> 65.

Id. (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58

(1987)).  The Supreme Court has held that ERISA's civil

enforcement mechanism, found in 29 U.S.C. § 1132(a), "is one of

those provisions with such extraordinary pre-emptive power that

it converts an ordinary state common law complaint into one

stating a federal claim for purposes of the well-pleaded

complaint rule.  Hence, causes of action within the scope of the

civil enforcement provisions of § 502(a) are removable to federal

court." Davila, 542 U.S. at 209 (internal quotation marks and

citation omitted);[6] see also Darcangelo, 292 F.3d at 187 ("The

Supreme Court has determined that ERISA's civil enforcement

provision, § 502(a) (29 U.S.C. § 1132(a)), completely preempts

state law claims that come within its scope and converts these

state claims into federal claims under § 502.").  The parties

agree that for a putative state law claim to be completely

preempted by ERISA:

> (1) the plaintiff must have standing under § 502(a) to
> pursue its claim; (2) its claim must "fall[] within the
> scope of an ERISA provision that [it] can enforce via §

---

[6] Employee Retirement Income Security Act of 1974, Pub. L.
No. 93-406, § 502(a), 88 Stat. 829, 891 (1974) is codified at 29
U.S.C. § 1132(a).

> 502(a)"; and (3) the claim must not be capable of
> resolution "without an interpretation of the contract
> governed by federal law," i.e., an ERISA-governed
> employee benefit plan.

Sunoco Prods. Co. v. Physicians Health Plan, Inc., 338 F.3d 366,

372 (4th Cir. 2003).  See also Davila, 542 U.S. at 210-14.

        The first group of claims, consisting of Count II and

the portion of Count IV asserting a claim for breach of written

contract, require consideration of the Plan and the Agreement and

Release for their resolution.  Count II states that "[d]efendants

failed and refused to pay Plaintiff under the Wells Fargo Salary

Continuation Pay Plan at an annual base salary of $201,500."

(Compl. ¶ 30).  Count IV states that "[t]he Plan and 'Agreement

and Release,'. . . constitute a written contract between

Plaintiff and Defendants," (Id. ¶ 39), and that the defendants'

failure to pay Thomas at a base salary of $201,500 under the Plan

and the Agreement and Release constitutes a breach of contract.

(Id. ¶ 43).

        Section 1132(a)(1) of ERISA confers standing upon "a

participant or beneficiary."  In turn, 29 U.S.C. § 1002(7)

defines "participant" as "any employee or former employee of an

employer, . . . who is or may become eligible to receive a

benefit of any type from an employee benefit plan which covers

employees of such employer or members of such organization, or
whose beneficiaries may be eligible to receive any such benefit."
ERISA defines "employee benefit plan" as an "employee welfare
benefit plan or an employee pension benefit plan which is both an
employee welfare benefit plan and an employee pension benefit
plan." § 1002(3).  The plan here is clearly not an employee
pension benefit plan.  The question, then, is whether it is a
"employee welfare benefit plan" as that term is defined in §
1002(1).  While Thomas concedes that as a participant, she would
have standing to bring a claim under § 1132(a), she does not
concede that the Plan in question is an "employee welfare benefit
plan." (Mem. in Supp of Mot. to Rem. & Resp. to Mot. to Dismiss
at 7).  The parties do, however, agree that the Plan is properly
characterized as a "severance plan."  (Mem. in Supp of Mot. to
Rem. & Resp. to Mot. to Dismiss at 2 n.1; Resp. to Mot. to Rem. &
Reply to Resp. to Mot. to Dismiss at 3).

      Section 1002(1) provides that:

> The terms "employee welfare benefit plan" and "welfare
> plan" mean any plan, fund, or program which was
> heretofore or is hereafter established or maintained by
> an employer or by an employee organization, or by both,
> to the extent that such plan, fund, or program was
> established or is maintained for the purpose of
> providing for its participants or their beneficiaries,
> through the purchase of insurance or otherwise, (A)
> medical, surgical, or hospital care or benefits, or
> benefits in the event of sickness, accident,

> disability, death or unemployment, or vacation
> benefits, apprenticeship or other training programs, or
> day care centers, scholarship funds, or prepaid legal
> services, or (B) any benefit described in section
> 186(c) of this title (other than pensions on retirement
> or death, and insurance to provide such pensions).

For purposes of ERISA, the Department of Labor defines "employee welfare benefit plan" to include "those plans which provide holiday and severance benefits, and benefits which are similar." 29 C.F.R. § 25103-1(a)(3). Nevertheless, Thomas cites to three out-of-circuit cases for the proposition that a severance plan is not an ERISA welfare benefit plan when the plan provides for "mechanical calculation of benefits" and affords "automatic eligibility." (Mem. in Supp of Mot. to Rem. & Resp. to Mot. to Dismiss at 2 n.1). This is so, according to Thomas, because in such cases the severance plan lacks an "administrative scheme." (Id.)

The Supreme Court has noted that the focus of ERISA "is on the administrative integrity of benefits plans -- which presumes that some sort of administrative activity is taking place." Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 15 (1987). Here, despite Thomas' assertions to the contrary, the Plan, which states that it is an ERISA plan, contains an ongoing administrative scheme. The plan administrator "has full discretionary authority to administer and interpret the Plan."

21

(Plan at 11, Compl., ex. A).[7]  The plan administrator's duties include, among other things, resolving claims and appeals under the Plan, coordinating benefits under the Plan with other pay and benefits, and determining whether Plan benefits should terminate. (Id. at 8-10).  These responsibilities do not, as Thomas asserts, consist of mere "mechanical calculations."   (Mem. in Supp of Mot. to Rem. & Resp. to Mot. to Dismiss at 2 n.1)  Indeed, our court of appeals has stated that "[i]t is beyond question that plans established by an employer to provide severance benefits are employee welfare benefit plans within the scope of ERISA." Biggers v. Wittek Indus., Inc., 4 F.3d 291, 297 (4th Cir. 1993); see also Mass. v. Morash, 490 U.S. 107, 116 (1989) ("Thus, for example, plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans within the meaning of the Act."); Holland v.

_____

[7] The Plan and the Agreement and Release are properly considered in ruling on the motion to remand.  See Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995) ("the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction.").  As documents attached to, and incorporated by reference into the complaint, they are also properly considered in ruling on the motion to dismiss.  See Am. Chiropractic v. Trigon Healthcare, Inc. 367 F.3d 212, 234 (4th Cir. 2004) (document properly considered "in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.") (quoting Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)).

<u>Burlington Indus., Inc.</u>, 772 F.2d 1140, 1144 (4th Cir. 1985)
("ERISA governs employer severance pay plans whether funded from
general assets, as here, or from a special trust.") <u>aff'd</u> <u>sub</u>
<u>nom.</u> <u>Brooks v. Burlington Indus., Inc.</u>, 477 U.S. 901 (1986). The
court finds that The Wells Fargo & Company Salary Continuation
Pay Plan is an "employee welfare benefit plan" under § 1002(1)
and consequently an "employee benefit plan" under § 1002(3).
This being the case, Thomas has standing to bring a claim under §
1132(a) as an ERISA welfare benefit plan participant.

Proceeding with complete preemption inquiry, the court
must determine whether the claims in group one fall within the
scope of an ERISA provision that can be enforced under § 1132(a)
and whether the claims are capable of resolution without
interpretation of the Plan. A civil action may be brought by a
plan participant such as Thomas under § 1132(a)(1)(B) "to recover
benefits due to him under the terms of his plan, to enforce his
rights under the terms of the plan, or to clarify his rights to
future benefits under the terms of the plan." Our court of
appeals has held that where the contract in question in a breach
of contract claim is an ERISA plan, the claim is subject to both
conflict and complete preemption:

> We now turn to Darcangelo's fifth claim, her breach of
> contract claim. Because the contract in question is an

ERISA plan, this claim is clearly preempted.  ERISA §
502 permits plan participants to bring an action to
"enforce [the participant's] rights under the terms of
the plan." 29 U.S.C. § 1132(a)(1)(B). Accordingly, an
action to enforce the terms of a contract, when that
contract is an ERISA plan, is of necessity an
alternative enforcement mechanism for ERISA § 502 and
is therefore "related to" an ERISA plan and preempted
by § 514 . See <u>Aliff v. BP America Inc.</u>, 26 F.3d 486
(4th Cir. 1994); McMahon v. Digital Equipment Corp.,
162 F.3d 28, 38 (1st Cir. 1998).  Because Darcangelo's
breach of contract claim is an alternative enforcement
mechanism to § 502, it is also completely preempted --
that is, transformed into a federal claim. This means
that removal was proper.

<u>Darcangelo</u>, 292 F.3d at 194-95;  <u>See also Biggers</u>,4 F.3d at 298

("Because ERISA preempts . . . [plaintiff's] common law contract

claim, his claim should have been tried before the court under

the principles of ERISA.").  Thomas asserts that her breach of

contract claim merely "impacts" the Plan by increasing the base

salary used to determine covered pay and therefore does not

require "interpretation" of the Plan.  (Mem. in Supp. of Mot. to

Rem. & Resp. to Mot. to Dismiss at 11).  The word

"interpretation," however, is defined as "[t]he process of

determining what something, esp. the law or a legal document

mean; the ascertainment of meaning to be given to words or other

manifestations of intention."  <u>Black' Law Dictionary</u> (8th ed.

2004).  A contract must be interpreted in order to determine

whether it has been breached.  The court finds that the breach of

written contract claim in Count IV is completely preempted.

24

Count II seeks recovery for the defendants' failure to pay Thomas under the Plan at an annual base salary of $201,500 within 72 hours following the end of each payroll period following January 18, 2007.  Thomas contends that the claim is for violation of § 21-5-4(b) of the WPCA and therefore not completely preempted.  (Mem. in Supp. of Mot. to Rem. & Resp. to Mot. to Dismiss at 9).  Section 21-5-4 provides that, "[w]henever a person, firm or corporation discharges an employee, such person, firm or corporation shall pay the employee's wages in full within seventy-two hours."  While ERISA contains no such requirement, this does not mean that Count II is not completely preempted.  The broad scope of ERISA preemption,

> was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities.  A patchwork scheme of regulations would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them.

Fort Halifax, 482 U.S. at 11.  In Davila, the Supreme Court noted that "[t]he limited remedies available under ERISA are an inherent part of the 'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."  542 U.S. at 215.  Consistent with the goal of creating a uniform set of regulations

25

and remedies relating to ERISA plans, the Court in Davila went on

to note that the preemptive force of § 1132(a) is not "limited to

the situation in which a cause of action precisely duplicates a

cause of action under ERISA § 502(a)." Id. at 26.  Indeed,

"Congress' intent to make the ERISA civil enforcement mechanism

exclusive would be undermined if state causes of action that

supplemented the ERISA § 502(a) remedies were permitted, even if

the elements of the state cause of action did not precisely

duplicate the elements of an ERISA claim." Id.  At its core, the

claim in Count II is for increased benefits under the Plan.

Thomas' claim under § 21-5-4(b) supplements § 1132(a) by

requiring payment of benefits under ERISA plans within 72 hours

of the end of each payroll period.  To allow the claim to proceed

would create a "patchwork scheme of regulation."  The court

therefore finds that Thomas' claim in Count II falls within the

scope of § 1132(a)(1)(B) as seeking to recover benefits due under

the terms the Plan.  Because the benefits Thomas seeks are only

payable because of the Plan, Count II requires interpretation of

a plan governed by ERISA.  See id. at 213 (stating that because

state law liability did not arise independently of the terms of

an ERISA plan, "interpretation of the terms of respondent's

benefit plans forms an essential part of their [state law

claim].").  Accordingly, the claim in Count II is also subject to

complete preemption.

The claims in the second group are of a different ilk. Counts I and III seek recovery under WPCA § 21-5-4(b) for failure to pay past due compensation under the alleged oral agreement of May 11, 2006, within 72 hours of the end of Thomas' employment with the WFB. Both claims, therefore, hinge on Thomas' recovery under Count IV for breach of the oral contract of May 11, 2006. The oral contract between the defendants and Thomas was breached, if at all, on June 11, 2006, or the nearest pay period when Thomas' salary was not increased to $201,500 and stock options were not provided.

The Department of Labor regulation interpreting the definition of employee welfare benefit plan contained in § 1002(1) provides: "Payroll practices.  For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include . . . Payment by an employer of compensation on account of work performed by an employee." 29 C.F.R. § 2510.3-1(b).  The claims in group two fit within this definition.  Thomas seeks compensation she claims is due for work performed prior to the termination of her employment with WFB on January 18, 2007.  Compensation for work performed prior to the end of Thomas' employment with WFB is payable independently of the Plan and therefore ERISA simply is not

27

implicated.  Citing to the second page of the Plan, the
defendants assert that "the Plan provides the exclusive benefits
an eligible employee may receive upon a qualifying event."
(Resp. to Mot. to Rem. & Reply to Resp. to Mot. to Dismiss at 6).
While the Plan provides the exclusive mechanism for payment of
severance benefits following a qualifying event; it does not
govern the payment of compensation earned prior to a
participant's termination.[8]  Because the claims in group two do
not seek to recover benefits or enforce Thomas' rights under an
ERISA plan, they do not fall within the scope of § 1132(a) and
are not subject to complete preemption.

Being completely preempted, the claims in group one are
"converted into federal claims" under ERISA.  <u>Darcangelo</u>, 292
F.3d at 187; <u>see also</u> <u>Custer v. Sweeney</u>, 89 F.3d 1156, 1165 (4th
Cir. 1996) ("The complete preemption doctrine . . . trumps the
plaintiff's characterization of his claim by converting an
ordinary state common law complaint into one stating a federal
claim.") (internal quotation marks omitted); <u>King v. Marriott</u>

---

[8] To say that the Plan does not govern payment of
compensation Thomas earned while she was employed by WFB is not
to say that the terms of the Plan and the Agreement and Release
have no effect on Thomas' claims seeking such compensation.
While the Plan is not the mechanism for recovery of compensation
earned, the Plan and the Agreement and Release affect the claims
in group two to the extent they have been waived.

Int'l, Inc. 337 F.3d 421, 425 ("In cases of complete preemption .
. . the plaintiff simply has brought a mislabeled federal claim,
which may be asserted under some federal statute.").  The court,
therefore, possesses federal question subject matter
jurisdiction, and the action was properly removed.  See 28 U.S.C.
§§ 1331 and 1441.  All claims in the complaint form part of the
same case or controversy because they "derive from a common
nucleus of operative fact."  Axel Johnson, Inc. v. Carroll
Carolina Oil Co., Inc., 145 F.3d 660, 662 (4th Cir. 1998)
(quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725
(1966)).  That being the case, the remaining state law claims are
subject to the court's supplemental jurisdiction. See 28 U.S.C. §
1367(a).  Accordingly, the motion to remand is denied.


B. Motion to Dismiss


        The defendants' argument for dismissal is two-fold.
First they argue that all claims in the complaint are barred by
the waiver provision of the Agreement and Release.  (Mem. in
Supp. Mot. to Dismiss at 18).  Defendants argue next that
dismissal is called for because Thomas failed to exhaust her
administrative remedies under ERISA.  (Id.)  Because only Count
II and Thomas' claim for breach of written contract in Count IV

29

are completely preempted, the latter argument applies only to
those claims.

        "An ERISA welfare benefit plan participant must both
pursue and exhaust plan remedies before gaining access to the
federal courts." Gayle v. United Parcel Serv., Inc. 401 F.3d
222, 226 (4th Cir. 2005).  While the exhaustion requirement is
not explicit in the text of ERISA, it "rest upon the Act's text
and structure as well as the strong federal interest encouraging
private resolution of disputes." Makar v. Health Care Corp. of
the Mid-Atlantic, 872 F.2d 80, 82 (4th Cir. 1989); White v. Sun
Life Assurance Co. of Canada, 488 F.3d 240, 247 (4th Cir. 2007)
(collecting cases requiring exhaustion and stating "courts have
universally found an exhaustion requirement in part because
statutory text and structure establish these twin remedies of
administrative and judicial review as part of a single scheme.").
Courts require exhaustion of administrative remedies, "to help
reduce the number of frivolous lawsuits under ERISA; to promote
the consistent treatment of claims for benefits; to provide a
nonadversarial method of claims settlement; and to minimize the
costs of claims settlement for all concerned." Harrow v.
Prudential Ins. Co. of Am., 279 F.3d 244, 249 (3d Cir. 2002).
Generally, if administrative remedies have not been exhausted,

30

ERISA claims must be dismissed.  See Gayle, 401 F.3d at 230;
Makar, 872 F.2d at 83.

In accordance with 29 U.S.C. § 1133(2), and 29 C.F.R. §
2560.503-1 promulgated thereunder,[9] the Plan sets forth an
administrative scheme for review of participants' claims.  (Plan
at 9-10, Compl., ex. A).  Thomas was required to avail herself of
the avenue of redress provided by the Plan prior to filing suit.
While not stating that she submitted a claim under the Plan,
Thomas contends that she was not required to "plead facts
regarding her efforts to pursue administrative remedies," and
that such "matters are appropriately addressed by discovery."
(Mem. in Supp. of Mot. to Rem. & Resp. to Mot. to Dismiss at 12-
13).  Despite her assertions to the contrary, the onus was indeed
on Thomas to plead exhaustion.  See Byrd v. MacPapers, Inc., 961
F.2d 157, 160-61 (11th Cir. 1992) ("we hold that the district

---

[9] In pertinent part § 1133, titled "Claims procedure"
provides:
 In accordance with regulations of the Secretary, every
 employee benefit plan shall--
 . . . .
 (2) afford a reasonable opportunity to any participant
 whose claim for benefits has been denied for a full and
 fair review by the appropriate named fiduciary of the
 decision denying the claim.
Section 2560.503-1 "sets forth minimum requirements for employee
benefit plan procedures pertaining to claims for benefits by
participants and beneficiaries."  § 2560.503-1(a).

court did not abuse its discretion in finding that plaintiff failed to plead exhaustion of administrative remedies . . . Plaintiff did not allege anything about whether she pursued any available relief under the claims procedures terms of the MacPapers' employee benefit plan."); see also Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief.").  Thomas notes that the exhaustion requirement is subject to a futility exception.  That exception is, however, very narrow.  A showing of futility must be "clear and positive."  See Makar, 872 F.2d at 83 (noting "appellants have not shown that they would be denied access to the claims procedures provided by the CareFirst and Provident plans.  Appellants' bare allegations of futility are no substitute for the 'clear and positive' showing of futility other courts have required before suspending the exhaustion requirement."); Hickey v. Digital Equip. Corp., 43 F.3d 941, 945 (4th Cir. 1995) (finding that plaintiffs "have not made the 'clear and positive' showing of futility required to circumvent the exhaustion requirement.").  In any event, Thomas has not plead futility and does not even argue that submission of a claim under the Plan would have been futile; she merely points out that a futility exception exists.  (Mem. in Supp. Mot. to Rem. & Resp. to Mot. to Dismiss at 13).

The Plan states that should a participant wish to file a claim, in the event of a position elimination the claim must be filed within 90 days of the date the participant learns the amount of salary continuation benefits available under the Plan. (Plan at 9, Compl., ex. A).  While the date Thomas was informed of the amount of benefits she was to receive has not been provided, it is undisputed that she was terminated on January 18, 2007.  It also appears undisputed that Thomas was paid at least some portion of her salary continuation benefits following her termination date.  (See, e.g., Pl.'s Mem. in Supp. of Mot. to Rem. at 9 ("Count II alleges that Defendants' failure to pay Thomas $201,500 beginning in June, 2006, resulted in her severance pay being significantly diminished. Each payment of severance compensation at the diminished rate violates the WPCA for its failure to pay compensation when due." (emphasis added)); Def.'s Reply at 6-7 ("The essence of Thomas' claims challenges the benefits she received under the Plan, the only permissible source of payment following Thomas' termination from employment with Wells Fargo") (emphasis added).

Thomas' post-termination challenge thus appears directed at the amount of the benefits she was entitled to receive.  She thus was on notice, as early as her first salary

continuation payment, that defendants were paying her at a rate lower than that to which she would assert she was entitled.  That first payment would have come, at the latest, on the next pay date following her termination, presumably in January or February 2007.  (See Plan at 4 ("You will continue to receive payments on Wells Fargo's regularly scheduled paydays for as long as you are eligible,")).

Inasmuch as Thomas apparently did not avail herself of the administrative process at any time prior to instituting this action on September 18, 2007, the 90 day period for filing a claim has long since passed.  The court in Gayle held that where the time for filing a claim under an ERISA plan has expired, "dismissal with prejudice is required."  401 F.3d at 230.  Accordingly, Thomas' ERISA claims in Count II, and Count IV for breach of written contract, are dismissed with prejudice.

In order to qualify for salary continuation pay under the Plan, Thomas was required to sign a release agreeing "to give up any and all claims, actions or lawsuits against Wells Fargo that relate to your employment with Wells Fargo."  (Plan at 6, Compl., ex. A).  On January 17, 2007, "in exchange for salary continuation pay," Thomas signed the Agreement and Release whereby she released the defendants "from all claims,

34

liabilities, demands and causes of action, known or unknown,
likely or unlikely, which you may have or claim to have against
the Company, as a result of your employment or separation from
employment. . . . [including claims] for compensation due for any
services performed by you . . . [and] claims for breach of
express or implied contract." (Agreement & Release at 3, Compl.,
ex. B). The defendants argue that Thomas' claims in Count I and
III, and for breach of the oral contract in Count IV are barred
by this provision of the Agreement and Release. (Mem. in Supp.
Mot. to Dismiss at 19).

        Thomas does not contend that the Agreement and Release
is invalid. On the contrary, Thomas asserts that "[t]he Plan and
'Agreement and Release,' . . . constitute a written contract
between Plaintiff and Defendants." (Compl. ¶ 38). Thomas argues
instead that § 21-5-10 of the WPCA prohibits waiver of her claim
to compensation earned while employed by WFB. The WPCA is
"remedial legislation designed to protect working people and
assist them in collection of compensation wrongly withheld."
Meadows v. Waco Equip Co., 530 S.E.2d 676, 688 (W. Va. 1999).
Given its remedial nature, the WPCA is to be construed "liberally
so as to furnish and accomplish all the purposes intended." Id.
Section 21-5-10 provides:

> Except as provided in section thirteen, no provision of
> this article may in any way be contravened or set aside
> by private agreement, and the acceptance by an employee
> of a partial payment of wages shall not constitute a
> release as to the balance of his claim and any release
> required as a condition of such payment shall be null
> and void.

The Supreme Court of Appeals of West Virginia has noted that in
enacting § 21-5-10 "the legislature has attempted to prevent
employers from abusing their positions by compromising the wages
of employees.  The language of W. Va. Code § 21-5-10 is
mandatory.  An employer must pay earned wages to its employees."
Szturm v. Huntington Blizzard Hockey Assocs. Ltd. P'ship, 516
S.E.2d 267, 273 (W. Va. 1999).  While § 21-5-10, as part of the
WPCA, is to be liberally construed, "legislative intention is the
controlling factor; and the intention of the legislature is
ascertained from the provisions of the statute by the application
of sound and well established canons of construction."  Meadows,
530 S.E.2d at 687.  Under the law of West Virginia, "'[i]n the
interpretation of statutory provisions the familiar maxim
expressio unius est exclusio alterius, the express mention of one
thing implies the exclusion of another, applies."  Phillips v.
Larry's drive-in Pharmacy, Inc., 647 S.E.2d 920, 928 (W. Va.
2007).  Section 21-5-10 provides that "the acceptance by an
employee of partial payment of wages shall not constitute a
release as to the balance of his claim and any release required

as a condition of <u>such payment</u> shall be null and void."
(emphasis added).  Applying the <u>expressio</u> <u>unius</u> canon of
construction to § 21-5-10, only waivers required as condition of
"partial payment of wages" are null and void.  Waivers required
in return for other consideration do not fall within the scope of
the statute.  Thomas, who is an attorney, was afforded 45 days to
review the Agreement and Release prior to deciding whether to
accept its terms.  (Agreement & Release at 1, Compl., ex. B).
The Agreement and Release plainly states that Thomas agrees to
the terms of the "General Release" "[i]n exchange for the salary
continuation pay described above, to which you are not otherwise
entitled."  (<u>Id.</u> at 3).

        In the context of interpreting the WPCA, the West
Virginia Supreme Court of Appeals noted that "a cardinal rule of
statutory construction is that significance and effect must, if
possible, be given to every section, clause, word or part of the
statute."  <u>Meadows</u>, 530 S.E.2d at 687.  To say that the release
at issue here is void under § 21-5-10 would be to disregard the
portion of § 21-5-10 which reads, "required as a condition of
such payment."  In light of these two longstanding canons of
construction, the waiver provision in the Agreement and Release
stands unaffected by § 21-5-10.  By signing the Agreement and

Release Thomas effectively waived all "claims for compensation due for any services performed by you," and "for breach of express or implied contract," in exchange for salary continuation pay under the Plan.  (Agreement & Release at 3, Compl., ex. B). While Thomas points out that the Agreement and Release "does not waive rights or claims which may arise after the date this Agreement is signed," (Agreement & Release at 4, Compl., ex. B), the defendants, according to the complaint, breached the oral contract months earlier on June 11, 2006, or the nearest pay period.  (Compl. ¶ 43).  The court finds that Thomas waived her claim for breach of the oral contract allegedly entered into on May 11, 2006, in return for salary continuation pay under the Plan.  Thomas' claim for breach of oral contract in Count IV is accordingly dismissed.

Pursuant to W. Va. Code § 12-5-4(b) of the WPCA, "[e]mployers have an obligation to pay employees' wages in a timely manner.  When an employer fires an employee, the employer "shall pay the employee's wages in full within seventy-two hours."  <u>Gress v. Petersburg Food, LLC</u>, 592 S.E.2d 811, 814 (W. Va. 2003) (quoting § 21-5-4(b)).  W. Va. Code § 21-5-4(e) provides,

> If a person, firm or corporation fails to pay an
> employee wages as required under this section, such

38

person, firm or corporation shall, in addition to the
amount which was unpaid when due, be liable to the
employee for three times that unpaid amount as
liquidated damages. Every employee shall have such lien
and all other rights and remedies for the protection
and enforcement of such salary or wages, as he or she
would have been entitled to had he or she rendered
service therefor in the manner as last employed; except
that, for the purpose of such liquidated damages, such
failure shall not be deemed to continue after the date
of the filing of a petition in bankruptcy with respect
to the employer if he or she is adjudicated bankrupt
upon such petition.

Count I seeks recovery under § 21-5-4(b) for defendants' failure
to pay Thomas the prorated difference between "her annual base
salary of $150,000 and agreed-upon annual base salary of $201,500
for the period of June 11, 2006, through January 18, 2007" within
the 72 hour period following Thomas' termination as an employee
of WFB.  (Compl. ¶ 26).  Similarly, Count III seeks recovery
under § 21-5-4(b) for the defendants' failure to provide Thomas
"with Wells Fargo stock options valued at approximately $30,000"
within 72 hours of her termination.  (Id. ¶ 34).

        To recover under § 21-5-4(b) for failure to timely pay
wages, wages must have been due to the discharged employee at the
time of their termination.  Because Thomas has waived her claim
in Count IV for breach of the oral contract of May 11, 2006, she
cannot show that at the time of her termination defendants were
required to pay her the additional compensation she seeks.

Additionally, by executing the Agreement and Release on January
17, 2007, Thomas released the defendants from "all claims,
liabilities, demands and causes of action known or unknown . . .
for compensation due for any services performed by you."
(Agreement & Release at 3, Compl., ex. B).  As discussed above,
the waiver does not run afoul of § 21-5-10 because it was in
consideration for salary continuation pay under the Plan, and not
required as a condition of partial payment of wages.  Thus, as of
January 18, 2007, when Thomas' employment with WFB ended, she no
longer possessed a "claim" to, and the defendants were not liable
to pay, the additional compensation Thomas asserts was due within
72 hours.  This being the case, Thomas has failed to state a
claim for violation of § 21-5-4(b).  Counts I and III are
accordingly dismissed.

     To summarize, Count II, and Count IV's claim for breach
of written contract, are dismissed because Thomas failed to
exhaust her administrative remedies under The Wells Fargo &
Company Salary Continuation Pay Plan.  Counts I and III, and
Count IV's claim for breach of the oral contract of May 11, 2006,
are dismissed because they are barred by the Agreement and
Release.  As Thomas has failed to state a viable claim, the
complaint is dismissed in its entirety.

40

IV.


        Based upon the foregoing discussion, it is,

accordingly, ORDERED as follows:

    1.    Plaintiff's motion to remand be, and it hereby is,

          denied; and

    2.    Defendants' motion to dismiss be, and it hereby is,

          granted.

        The Clerk is directed to forward copies of this written

opinion and order to all counsel of record.

                        DATED: September 14, 2010


                        John T. Copenhaver, Jr.
                        United States District Judge


41